**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
In re                                                            :          **Chapter 11**
                                                                 :
**49 BLEECKER INC.,**                                            :          **Case No. 21-10312 (MEW)**
                                                                 :
                                              **Debtor.**        :
------------------------------------------------------------------------x

## DECISION AFTER TRIAL

A P P E A R A N C E S :

ALTER & BRESCIA, LLP
New York, New York
*Attorneys for Debtor 49 Bleecker, Inc.*
  By:  Bruce Alter

FARBER SCHNEIDER FERRARI LLP
New York, New York
*Special Counsel for Debtor 49 Bleecker, Inc.*
   By:  Michael Farber
        Daniel Schneider

BELKIN BURDEN GOLDMAN, LLP
New York, New York
   By:  Lewis Lindenberg
        Jay Solomon

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

        This chapter 11 bankruptcy case was filed on February 16, 2021.  The debtor, 49

Bleecker Inc. (the "**Debtor**"), is the lessee of the third floor of a building located at 49 Bleecker

Street in Manhattan.  The lease ("**Lease**") is dated December 14, 2012 and was entered into

between the Debtor and the prior owner of the building, Rogers Investments NV LP ("**Rogers**

**NV**").  The building currently is owned by Rogers Investments NY, LLC ("**Rogers NY**"), which

apparently is an affiliate of Rogers NV.

Section 2.4 of the Lease provides the Landlord with an option to declare an early termination. Rogers NY contends that the early termination option was properly exercised in 2017 by Rogers NV (which owned the building at the time) and that the Lease terminated as of December 31, 2018. The Debtor denies that proper notices were sent in accordance with the requirements of the Lease, denies that the notices were received, and asserts a number of other defenses that I will review.

There was a considerable amount of litigation between these parties in the New York State courts that preceded the bankruptcy filing. Rogers NY filed an action in the Civil Court of the City of New York in 2019, seeking possession of the premises. The Civil Court issued a decision holding that it lacked jurisdiction. As I will explain later the parties disagree over the interpretation and the implications of the Civil Court's decision.

Rogers NY then filed suit in the Supreme Court of the State of New York. At some point in early 2020 the state court decided that a hearing would be held to determine whether a proper notice of early termination had been sent in accordance with section 2.4 of the Lease. The parties have not provided the Court with a detailed history of the state court litigation but for one reason or another that hearing was never held. A November 2020 hearing date was postponed apparently because the Debtor wished to change counsel, and then a January 11 hearing date was postponed because the Debtor did not appear with counsel. We have been informed by the parties that the New York State Court scheduled a final hearing date of February 17, 2021, but the Debtor filed its bankruptcy petition on February 16, 2021, thereby invoking the automatic stay and preventing the state court hearing from going forward.[1]

---

[1]    Until recently the docket in this bankruptcy case reflected a filing date of February 18, but the Clerk's office has investigated and confirmed that the filing occurred on February 16, and the docket entry for the Petition has been corrected.

Rogers NY promptly filed a motion seeking relief from the automatic stay on March 15, 2021.  [Dkt. No. 9.]  The Debtor opposed the motion and argued that any issues over the purported Lease termination should be resolved by me and not by the state court.  [Dkt. No. 19.]  The motion came on for hearing on April 20, 2021.  At that time I noted that it was clear that the Debtor's claimed rights, as well as the stay relief motion and other issues that would inevitably arise in the bankruptcy case (such as the application of deadlines in the Bankruptcy Code for the assumption or rejection of leases involving nonresidential real property), all depended on whether the Lease had validly been terminated before the filing of the bankruptcy case.  I further noted that some of those matters (such as the 120-day acceptance/rejection deadline under section 365(d)(4)) made it appropriate to obtain a prompt resolution of these issues and that the matter had been pending for some time in the state court without resolution.  The Debtor had urged me to decide the issues, and I said that if it were agreeable to the parties I would schedule the matter for a prompt trial on the merits to decide whether the Lease had terminated or whether it remained in effect.  The parties consented, and we scheduled a trial date of June 7, 2021.

During the last week in May and the first week of June the Debtor made several requests to postpone the scheduled trial, arguing that the Debtor wished to retain more specialized landlord/tenant counsel and that counsel would need additional time to prepare.  I approved the retention of additional counsel but I denied the requests for an adjournment.  The Debtor had had plenty of time since April 20, 2021 to retain specialized counsel if that was needed, not to mention the many months during which the Debtor could (and should) have hired counsel during the prior state court proceedings.  I ruled that any difficulties that new counsel might have due to their late hiring was attributable to the Debtor's own delays and that I would not postpone the scheduled trial.

We proceeded with the trial on June 7, 2021, which was held via Zoom.  Four witnesses testified.  Austen Rabbie of Livingston Management Services (which performed services for Rogers NV and later for Rogers NY) testified about the preparation and service of a notice of early termination and about the managing agent's records of rent charges and payments. William A. Budd of Federal Express testified about certain business records of that entity. Joanna Gonzalez, also of Livingston, testified about the mailing of certain notices.  Finally, Mr. Doran Zabari (who is the sole owner, sole officer and sole employee of the Debtor) testified about various matters, which testimony included his denial of receipt of the notice of early termination and his denial that the Debtor was ever in default under the Lease.

The Debtor has made a post-trial motion to reopen the record to include an additional exhibit and has made a post-trial request that I take judicial notice of information contained in a set of building department records.  Those requests are discussed below in the portions of this Decision that discuss issues to which the exhibit and the building department records are purportedly relevant.

I.      **The Form and Service of the Early Termination Notice**

The Lease is dated December 14, 2012.  It covers the entire third floor of the building located at 49 Bleecker Street in New York City.  Article I of the Lease says that the scheduled expiration date was to be January 31, 2023.  However, section 2.3 of the Lease says that the expiration date is December 31, 2022.  That difference is somewhat odd, though it is not relevant to the issues that are now before me.

Section 2.4 of the Lease provides the Landlord with an early termination option, as follows:

> Commencing at any time during the fifth (5th) year of the Term, and only during the fifth (5th) year of the Term, Landlord may provide notice of its

4

election, in Landlord's sole and absolute discretion to terminate this Lease without penalty prior to the Expiration Date, but only upon the delivery of a written notice (the "Early Termination Notice") to Tenant at least twelve (12) months prior to the effective date of such early termination.  In the event the Landlord shall exercise such right of early termination, the Tenant shall quit and surrender possession of the Demised Premises on or before the date specified in the Early Termination Notice (the "Early Termination Date").  Between the date Landlord shall give the Early Termination Notice and the Early Termination Date, Tenant shall continue to be obligated under the terms of this Lease . . . Upon any such early termination by Landlord, then, provided Landlord promptly returns Tenant's Security Deposit (if Tenant is not then in default) this Lease and the Term and estate hereby granted shall terminate at noon of such Early Termination Date specified in the Early Termination Notice as if such Early Termination Date were the Expiration Date of the Term.  In the event of Early Termination by Landlord as provided herein, Tenant shall be required to deliver the Demised Premises to Landlord in broom clean condition subject to reasonable wear and tear."

The Lease also contains certain provisions governing notices to the parties.  Section 25.1, entitled "Notices," provides as follows:

Whenever any notice is required or permitted hereunder, such notice shall be in writing and shall be:  (1) delivered by hand; (ii) delivered by a nationally recognized commercial overnight delivery service; or (iii) mailed postage prepaid by registered or certified mail, return receipt requested.  Such notices shall be effective: (a) in the case of hand deliveries when received; (b) in the case of an overnight delivery service, on the next business day after being placed in the possession of such delivery service, with delivery charges prepaid; and (c) in the case of registered or certified mail, upon delivery or refusal.  All such notices shall be directed as follows:  if to Tenant: at the address listed herein in Article I; if to Landlord: at the address listed herein in Article I, with a simultaneous copy sent in like manner to Oved & Oved LLP, 401 Greenwich Street, New York, NY 10013, Attn:  Terrence A. Oved, Esq.  Notices from either party may be given by its respective attorney.

Article I of the Lease listed the "Tenant" as "49 Bleecker Inc." and the Tenant's Address as "49 Bleecker Street, Third Floor, New York, NY 10012."

The evidence at trial demonstrated that Rogers NV was the Landlord under the Lease until April 2018.  In November 2017, Rogers NV prepared a notice purporting to exercise the early termination option granted by section 2.4 of the Lease.  A copy of the notice was introduced into evidence as Landlord's Exhibit B.  The notice was dated November 28, 2017 and

5

stated that the Landlord had elected to terminate the Lease effective December 31, 2018.  There

is no dispute that the notice was issued during the fifth year of the term of the Lease.  There is

also no dispute that the specified early termination date (December 31, 2018) was more than

twelve months after the date of the notice.  The Debtor argues, however, that notice was not in

proper form and also was not properly delivered.

### A.    The Debtor's Name and Address

The Debtor first argues that pursuant to the Lease any notice of early termination had to

be addressed to "49 Bleecker, Inc." at 49 Bleecker Street, Third Floor, New York, NY 10012.

The actual notice in this case was addressed as follows:

> Mr. Doron Zabari
> 49 Bleecker Inc.
> 49 Bleecker Street, Third Floor
> New York, NY  10012

The Federal Express airbill that was prepared and used similarly identified the individual

"recipient" as "Doron Zabari," the "company" as "49 Bleeker Inc." and the address as "49

Bleecker St., 3rd Floor, NY, NY 10012."

The Debtor contends that as the result of the inclusion of Mr. Zabari's name the notice

actually was sent "to" Mr. Zabari as though he were the Tenant, and that it was not sent "to" 49

Bleecker Inc.  *See* Debtor's Post-Trial Submission [Dkt. No. 50] at 1.  The Debtor argues that the

notice therefore was not in strict compliance with the Lease and was not effective.

The Debtor's complaints about the form of notice are without merit.  The name "49

Bleecker Inc." plainly appears in the notice itself and on the Federal Express address label.  Mr.

Zabari acknowledged, during his testimony, that he was the sole owner, sole officer and sole

employee of 49 Bleecker Inc.  Mr. Zabari unquestionably knew that it was 49 Bleecker Inc. who

was the Tenant, and it was unquestionably clear that the notice was directed to 49 Bleecker Inc.

6

in that capacity.  Notably, Mr. Zabari never testified that he was under any confusion (when he eventually saw the notice) as to the intended recipient of the notice.

It is true, as the Debtor contends, that courts often require "strict" compliance with notice provisions in a Lease.  In the cases that the Debtor has cited, however, the alleged defect in notice has been based on the use of an improper means of delivery, or the failure to comply with provisions of a lease that require a landlord to specify the grounds for an asserted default, or the failure to send any notice at all.[2]  In fact, in two of the cases cited by the Debtor the courts rejected complaints about notices.[3]  In this particular case, on the basis of these authorities, the Debtor urges me to treat the notice as ineffective due to the *addition* of an individual's name above the Debtor's name – even though in this case the named individual (Mr. Zabari) is the sole owner, sole officer and sole employee of the Debtor.  Not surprisingly, the Debtor has failed to cite any authorities that support the proposition that the *addition* of Mr. Zabari's name rendered the notice ineffective, and we are aware of no such authorities.

The gist of the Debtor's argument – that the inclusion of Mr. Zabari's name means that the notice of early termination actually was directed "to" Mr. Zabari individually and was not "to" 49 Bleecker Inc. as the actual Tenant – is a strained interpretation of the notice that is

---

[2]   *See Jacobson v. Raff*, 30 Misc. 3d 143(A) (N.Y. Sup. App. Term 2011) (notice was not sent by certified mail as the lease required and failed to declare a termination of the lease); *Hendrickson v. Lexington Oil Co., Inc.*, 41 A.D.2d 672, 672-73 (2d Dep't 1973) (failure to send any notice of a rent default when the lease required such notice and required that it be sent by certified mail).

[3]   *See Metro Transp. Auth. v. Cosmopolitan Aviation Corp.*, 99 A.D.2d 767, 768 (2d Dep't 1984), *aff'd*, 64 N.Y.2d 623 (1984) (rejecting a party's argument that notice had been sent to the wrong address where actual notice was received and the recipient did not complain about notice until more than six months after a trial had begun); *Arverne Ltd. Profit Hous. Corp. v. Taft's Dental, P.C.*, 63 Misc. 3d 984, 988 (N.Y. Civ. Ct. Queens Cty. 2019) (rejecting a complaint that a notice had been sent to "Taft's Dental P.C." without being directed to the attention of two named individuals on the ground that the notice only needed to comply with statutory requirements and that the notice did so)

wholly unreasonable under the circumstances. There is nothing in the notice that identifies Mr. Zabari personally as the "Tenant." Although the text of the notice refers to "your" rights under the Lease, there is nothing in the notice or otherwise in the record that supports the Debtor's contention that this constituted an assertion that it was Mr. Zabari personally (and not 49 Bleecker Inc.) who was the Tenant. The appearance of Mr. Zabari's name in other internal records of the managing agent similarly is not evidence that the Landlord actually thought that Mr. Zabari (and not the Debtor) was the Tenant. I find that the addition of the name of Mr. Zabari (the sole owner, officer and employee of the Debtor) may have had the effect of calling his attention to the notice on behalf of the Debtor, but it did not mean that the notice somehow treated Mr. Zabari as though he (and not the Debtor) were the Tenant. The Debtor's name and address for notice purposes was not a computer password, such that any addition of letters somehow rendered the notice ineffective. The notice was directed "to" the Debtor as Tenant, notwithstanding the addition of the name of the Debtor's sole owner, sole officer and sole employee. If the notice really had been addressed only Mr. Zabari individually (on the theory that he was the real Tenant and the Debtor was not), then there would have been no reason for the Debtor's name to be included in the notice.

"Strict" interpretation of a contract, or any other legal document or statute, does not call for blind literalism, and does not mean that a court should endorse absurd interpretations that defy common sense. *Cf. Cent. States, S.E. & S.W. Areas Pension Fund v. Lady Baltimore Foods, Inc.*, 960 F.2d 1339, 1345 (7th Cir. 1992) ("the interpreter is free (we would say compelled) to depart in the direction of sense" where strict interpretation would yield absurd results). The purpose of strict compliance with contractual notice terms is to ensure that parties' legitimate contract rights are protected. It is ridiculous to suggest that these parties intended that if a notice

were sent to the Debtor the addition of Mr. Zabari's name to that notice would render it ineffective. The complaint about the effect of the inclusion of Mr. Zabari's name is just a strained and arbitrary effort to frustrate the parties' contract rights, not a legitimate effort to enforce them. The inclusion of Mr. Zabari's name on the notice in this case was an immaterial addition that could not possibly have actually deceived anyone as to who the intended recipient was. It had no more effect on the validity of the notice than other immaterial differences or typographical errors might have had.

I find based on the facts that the notice of early termination actually was directed to 49 Bleecker Inc. as the Tenant (notwithstanding the addition of Mr. Zabari's name in the address box), that it was clear to Mr. Zabari (and understood by him) that the notice was directed to 49 Bleecker Inc. as the Tenant with respect to its tenancy under the Lease, that there was no reasonable possibility that the notice could have been construed otherwise, and that the notice was effective and sufficient under the terms of the Lease.

### B.    Whether the Federal Express Notice Was Delivered

The evidence confirmed (and I so find) that the early termination notice was placed in a proper Federal Express delivery envelope with the delivery charges prepaid. There is no dispute that Federal Express is a "nationally recognized commercial overnight delivery service." Section 25.1 of the Lease provides that when a notice is sent by such a delivery service it is "effective" "on the next business day after being placed in the possession of such delivery service, with delivery charges prepaid." I find from the evidence that in this case the early termination notice was placed in the possession of Federal Express on November 29, 2017. Pursuant to section 25.1 of the Lease, the notice therefore was "effective" on November 30, 2017.

The Debtor argues that the date on which the notice was "effective" is different from the date on which the delivery of the notice was "completed," and contends that the Landlord must prove that the notice was actually delivered to (and received by) 49 Bleecker Inc. in order for the notice to be given effect. Rogers NY has disagreed. It notes that the beginning of section 25.1 of the Lease states that notice may be "delivered" by hand or by overnight delivery service or by registered or certified mail, but that the next sentence of Section 25.1 of the Lease then plainly states the circumstances under which "delivery" or "receipt" is a condition to the effectiveness of a notice. Section 25.1 states that notices are effective "when received" if they are served by hand-delivery, or by "delivery" or "refusal" if they are sent by certified or registered mail. However, there is no "delivery" or "receipt" requirement to the effectiveness of notices sent by Federal Express or other recognized overnight delivery services.

I am inclined to agree with Rogers NY's interpretation of section 25.1, but I need not decide that issue, because as a factual matter I reject the Debtor's contentions that the notice was not actually delivered to the Debtor and received by the Debtor. The evidence at trial showed convincingly that the package actually was delivered to 49 Bleecker Inc. at its designated address. The somewhat cryptic Federal Express records include a code showing the item was left at the "front door," and the Debtor speculated (with no supporting evidence) that the envelope may have been left outside of the building or in an open vestibule at the entrance to the building. The Debtor also speculated (again with no evidence) that someone might have stolen the package. However, the Federal Express records also contained another more specific code that Mr. Budd interpreted as meaning that the package had been left at the door of 49 Bleecker Inc. on the third floor of the building at 2:53 p.m. on November 30, 2017. I have considered all of the testimony, exhibits and argument about these points. I find that the Federal Express

delivery was properly delivered to the door of 49 Bleecker Inc. on the third floor of the building at 49 Bleecker Street on November 30, 2017 at 2:53 p.m.

Mr. Zabari testified that any office that the Debtor had on the third floor at 49 Bleecker Street was only occasionally occupied and otherwise was locked. The Debtor argues that if, as a result, a package was left by the front door – where someone might have stolen it – then I should find that the "delivery" never actually occurred. But I find that the package actually was "delivered" to the address that the Debtor specified. Even if the Debtor's own failure to maintain personnel at the site had exposed the package to a risk of theft, and even if the package had been stolen, the risk of theft after the delivery of the package was a risk that the Debtor created and assumed by not occupying its designated office and by not supplying a more secure address to which deliveries should be made. The Debtor's assertion that the package should be treated as though it was not actually "delivered" at all, based on the fact that the Debtor's conduct may have left it exposed to others, is not reasonable and I reject it.

More importantly, I reject the Debtor's unfounded speculations about a possible theft of the Federal Express package, and I find that in fact the Debtor and Mr. Zabari actually received it. I note that during the course of the trial Mr. Zabari denied receiving the Federal Express package; denied receiving a separate copy of the notice of early termination that was sent by certified mail (described below); denied receiving another copy of the notice that was sent by regular mail; and denied receiving other correspondence relating to the early termination. If he were to be believed, he never received any of the relevant notices and letters that were sent to him. His denials were self-serving and were not credible. I find after considering the Federal Express records and other evidence, and after evaluating the credibility of the witnesses, that in fact the Federal Express envelope containing the notice of early termination was actually

11

delivered to the Debtor at the address specified in the Lease and that the Debtor and Mr. Zabari

actually received it on or about November 30, 2017.

### C.    The Notice Sent by Certified Mail

The evidence shows that Livingston Management sent an additional copy of the early

termination notice on December 21, 2017, this time by certified mail, return receipt requested.

The envelope was addressed as follows:

> Doron Zabari
> 49 Bleecker Street
> 3rd Floor
> New York, NY 10012

The formal notice that was included in the envelope, however, was addressed as follows:

> Mr. Doron Zabari
> 49 Bleecker Inc.
> 49 Bleecker Street, Third Floor
> New York, NY  10012

For the reasons stated above I have already held that the notice of early termination referred

expressly to 49 Bleecker Inc. and that the inclusion of Mr. Zabari's name did not render the

notice ineffective.  I also find that the omission of "49 Bleecker Inc." from the mailing address

on the outside of the envelope for the certified mail notice is an inconsequential omission in light

of the inclusion of that information on the notice itself, particularly given the fact that Mr. Zabari

admittedly is the sole owner, officer and employee of 49 Bleecker Inc., so that there was no

possibility that a notice addressed to him would somehow escape the attention of the Debtor.

As noted above, Mr. Zabari also denied receipt of the copy of the early termination notice

that was sent by certified mail.  Rogers NY introduced into evidence a signed certified mail

receipt, but Mr. Zabari denied that the signature was his.  No handwriting expert was offered as a

witness and the only other signature by Mr. Zabari set forth in the documents in evidence is his

signature on the Lease.  There are some similarities but also some possible differences between the signature on the Lease and the signature on the certified mail receipt.  On the whole, however, I did not find Mr. Zabari's denial of receipt of the notice to be credible.  I cannot state for certain if he had someone else sign for the notice, or if he varied his signature in some way, but I find based on the evidence (and my evaluations of the witnesses' credibility) that Mr. Zabari actually received the notice that was sent by certified mail.  It is therefore not necessary for me to address the parties' separate contentions regarding the presumption (under New York law) that an item sent by certified mail has actually been delivered.

### D.    The Contents of the Notice

In its post-trial submission, the Debtor has argued that the notice sent by the Landlord allegedly did not conform to standards that would have been applicable if the Landlord had sought to terminate the Lease and to evict the Debtor based on a payment default.  But in this case the termination of the Lease is based on the exercise of an early termination option.  That early termination option was available to the Landlord without regard to the existence of a default.  A default may be relevant in deciding whether a security deposit had to be returned once the early termination date was reached at the end of 2018 (as discussed below), but when the early termination notice was sent in late 2017 the Landlord was exercising a contractual option and was not purporting to terminate the Lease based on a payment default.  The Debtor's various arguments about the procedural prerequisites that allegedly would have applied if the Landlord had sought to terminate the Lease based on a payment default, or as to what a notice of such a default might have needed to say if termination were being sought on that basis, rest on a faulty premise and raise issues that are not relevant.

For the foregoing reasons, I find that Mr. Zabari received a notice of early termination that was in proper form pursuant to section 2.4 of the Lease; that the notice was properly addressed and delivered (both by Federal Express and by certified mail); that 49 Bleecker Inc. and Mr. Zabari actually received the Federal Express notice on November 30, 2017; that the Debtor and Mr. Zabari actually received the notice sent by certified mail on December 23, 2017; and that the Debtor's complaints about the form of the notice, and the manner of service, are without merit.

## II.    Whether Other Conditions Were Met

Section 2.4 of the Lease provides that upon an early termination the Landlord is required to return the Tenant's security deposit if the Tenant is not then in default:

> Upon any such early termination by Landlord, then, provided Landlord promptly returns Tenant's Security Deposit (if Tenant is not then in default) this Lease and the Term and estate hereby granted shall terminate at noon of such Early Termination Date specified in the Early Termination Notice as if such Early Termination Date were the Expiration Date of the Term.  In the event of Early Termination by Landlord as provided herein, Tenant shall be required to deliver the Demised Premises to Landlord in broom clean condition subject to reasonable wear and tear.

Lease, § 2.4.  Rogers NY argues that 49 Bleecker Inc. was in default for nonpayment of rent both at the time the notice of early termination was sent and also as of December 31, 2018, and that 49 Bleecker Inc. has never relinquished the Demised Premises as it is required to do.  The Debtor contends that the Landlord was required to return its security deposit and that this condition to the termination of the Lease has never been met.

### A.    Whether the Civil Court Decided This Issue

In 2019, Rogers NY attempted to obtain an ejectment order from the Civil Court of the City of New York.  Various rules (unique to state court practice) determine whether the Civil Court has jurisdiction over an issue or whether an action must be brought in the Supreme Court.

14

Arcane distinctions under state law between "conditions subsequent" and "conditional limitations" are often decisive in resolving that jurisdictional question.

Rogers NY apparently contended in the Civil Court that the termination of the Lease was automatic once the notice of early termination was sent.  The Civil Court noted, however, that under the Lease the termination is effective "provided Landlord promptly returns Tenant's Security Deposit (if Tenant is not then in default)."  The Civil Court further held that this provision therefore required something other than the mere passage of time for the termination to take effect – namely, the landlord had to decide whether the tenant was in default and whether the security deposit needed to be returned.  The Court therefore decided that the provision operated as a "condition" and dismissed for lack of jurisdiction.

The Debtor has repeatedly argued that the Civil Court somehow decided that the Landlord actually owed the security deposit to the Tenant, or that the Tenant was not then in default, or that that the termination of the Lease never took effect and will not take effect until future conditions are satisfied.  I have now on several occasions ruled that the Civil Court held no such thing.  The Civil Court did not (as Debtor suggests) hold that there was no default, or that in fact the return of the security deposit was actually required under the circumstances of this case.  It simply noted that because of the provision in the Lease the Civil Court had no jurisdiction to decide whether the return of the security deposit was required, or whether the Debtor was in default, and that such issues had to be resolved elsewhere.  That is quite clear from reading pages 4 through 6 of the Civil Court's decision.  At page 4, for example, the Civil Court observed, after describing the last sentences of section 2.4 of the Lease:

> That is, upon Landlord's twelve-month notice to terminate, then – *if* Tenant is not in default (apparently at Landlord's sole determination)—Landlord must "promptly return" Tenant's security deposit.  In other words, the termination is not self-executing; termination requires additional decision-making and

> action . . .***Thus, whether there was a default or not – a point contested by
> the parties – that issue cannot be addressed here because the Early
> Termination Provision acted as a condition, not a conditional limitation
> which would have afforded this Court jurisdiction***.

*See* Civil Court Decision (Debtor's Exhibit 1) at 4-5 (emphasis added).  The Debtor vehemently

argues that the Civil Court held that in fact the Landlord actually failed to comply with

conditions to the termination of the Lease, but the Civil Court plainly did not do so.  It made no

findings as to whether the Debtor was or was not in default as of the early determination date.  It

therefore made no rulings as to whether the security deposit had to be returned.  It made no

rulings as to whether and when a termination of the Lease had actually taken effect, and it made

no rulings as to whether or not the Landlord's determinations as to the existence of a default

were correct.  The Civil Court simply held that because this disputed issue existed it could not be

said that the termination was automatically effective based solely on the passage of time, and that

the Civil Court did not have jurisdiction to decide the disputed issues regarding the security

deposit.  Instead, the question of whether a default existed that excused the return of the security

deposit, and the question of whether the termination took effect at the end of 2018, was a matter

that had to be decided elsewhere.

 After the conclusion of the trial the Debtor asked the Court to reopen the record and to

admit into evidence a copy of the Petition in the Civil Court proceeding.  The purported

relevance of this exhibit is to show that Rogers NY contended, in the Civil Court, that the early

termination of the Lease was automatic, and that the Civil Court rejected that contention.  The

Debtor has not offered any legitimate reason why the Petition was not previously designated as

an exhibit, but I see no prejudice and I will allow the Petition to be included in the evidentiary

record as Debtor's Exhibit 9.  However, there is nothing in the Petition itself that alters my

conclusion as to what the Civil Court held.  I have already noted above that Rogers NY

16

contended that the termination of the Lease was automatic and that the Civil Court had held instead that the effective date of the termination depended on whether or not the Landlord was required to return the security deposit. The Debtor argues as though the Civil Court actually held that the Landlord was obligated to return the security deposit and that the termination was not yet effective, but that interpretation of the Civil Court decision is plainly wrong. The Civil Court expressly stated that "whether there was a default or not – a point contested by the parties – that issue cannot be addressed here" because the very existence of that issue deprived the Civil Court of jurisdiction. Ex. 1 at 4-5. Nothing in the order purported to resolve the disputed question of whether a default existed and whether any part of the security deposit had to be returned.

### B.    Whether the Debtor Was in Default

The evidence at trial showed convincingly that the Debtor was in default for nonpayment of rent at virtually all times. As of November 2017 (when the notice of early termination was sent) the Debtor was in default by more than $278,000. *See* Landlord's Ex. E. As of the designated early termination date (December 30, 2018), the Debtor was in default by more than $423,000. *Id.*

Mr. Zabari disputed the existence of the default, but he did so only by offering vague testimony to the effect that he "often" or "regularly" made rent payments and that he believed full payments had been made, and that if anything less than full payments had ever been sent it must have been because Mr. Rogers (the deceased former owner of Rogers NV) had agreed to accept lesser payments. No specifics as to any such agreement, or any documentation of any such agreement, were ever identified. Mr. Zabari claimed to have collected bank records and other payment records for his attorneys, but the Debtor offered no evidence of actual payments that differed in any way from the payment records that were introduced into evidence.

17

The Debtor argues that it is difficult to believe that Rogers NV and Rogers NY would have allowed payment defaults of such size to accumulate without taking some action against 49 Bleecker Inc.  It is true that the record contains no explanation for the Landlord's inaction and that such inaction is puzzling.  But it is equally true that if the Debtor had actually made full payments (as Mr. Zabari contended) then I would have expected the Debtor to provide records of checks, bank transfers or other bank records showing such payments.  While Mr. Zabari said the Debtor had access to such records, none were offered.

I find that Mr. Zabari's testimony about the purported payments of full rent, and his vague testimony about the possibility of agreements by Mr. Rogers to accept less rent, lack credibility.  I find that the Debtor was in default by more than $278,000 at the time the early termination option was exercised in November 2017, and I find that the Debtor was in default by more than $423,000 as of the December 31, 2018 early termination date.  The parties have agreed that the Debtor's security deposit was in the amount of only $20,000, which was dwarfed by the amounts of the unpaid rent accruals at all relevant times.  The issue that the Civil Court felt it had no jurisdiction to decide (whether the Debtor was in default) plainly must be decided in the favor of Rogers NY.

Other defenses to the Debtor's rent obligations that the Debtor has asserted based on the tenancy of Jen Gatien, a residential undertenant of the Debtor protected under certain provisions of the Multiple Dwelling Law, are addressed in Part IV of this Decision.

### C.    Whether Section 2.4 Required an Immediate Return of the Security Deposit Before Any Determination of Whether a Default Existed

The Debtor has suggested at various times that the return of the full security deposit was a condition to the exercise of the early termination notice, such that the Debtor's $20,000 security deposit either should have been returned in 2017 (when the early termination notice was

18

sent) or in December 2018 (before the termination took effect or immediately when it took

effect). Those arguments are contrary to the plain language of the Lease.

Certainly no return of the security deposit was required in November 2017, when the

notice of early termination was sent. The Lease only speaks of the possible return of the deposit

"upon" the early termination (i.e., at the end of 2018), and not "upon" the mere notice that the

Landlord has decided to exercise the early termination right.

Section 2.4 provides that the leasehold estate shall terminate at noon on the Early

Termination Date provided that the Landlord "promptly" returns the security deposit, but it

cannot reasonably be said that this required a return of the deposit before the Debtor had even

returned the premises, and before the condition of the premises could even be assessed. In fact,

the Debtor's interpretation of section 2.4 is contrary to the plain language of the last sentence of

section 3.4(a) of the Lease, which states:

> In the event that Tenant shall fully and faithfully comply with all of the
> terms, provisions, covenants and conditions of this lease, the security shall be
> returned to Tenant *within thirty (30) days after* the expiration *or earlier*
> *termination* of this Lease after delivery of entire possession of the demised
> premises to Landlord.

Lease, § 3.4(a). In context, the requirement of that the security deposit be "promptly" returned,

provided the Debtor was not in default, simply meant that the return be made 30 days after the

termination and surrender of the premises, as section 3.4(a) of the Lease specified.

Section 3.4 of the Lease also gave the Landlord the right to "use, apply or retain the

whole" of the security deposit upon the Debtor's failure to cure a default, and section 2.4 stated

plainly that the return of the security deposit is not required if the Tenant is in default. Lease,

§§ 2.4, 3.4. The Debtor's contention that the Landlord was required to return the security deposit

at the time of the early termination – notwithstanding the existence of prior payment defaults and

19

notwithstanding the Debtor's failure to surrender the premises – is contrary to the plain language of the Lease.

### D. Whether the Effectiveness of the Termination Notice Was Delayed Until Disputes Over the Existence of a Default Could Be Determined

In its submissions the Debtor has also argued as though the early termination of the Lease could not take effect until after a conclusive resolution, by a court, of disputes as to whether a default existed and whether the return of all or some portion of the security deposit was required. The Debtor also has argued as though any dispute over the existence of a default should have proceeded just as though the Landlord were seeking to terminate the Lease based upon a payment default. The Debtor elicited testimony at trial, for example, to the effect that the Landlord did not send notice of payment defaults and did not send notices of termination of the Lease based on the nonpayment of rent. The Debtor also has argued in its post-trial submission that any effort to terminate the Lease based on payment defaults should be barred for lack of notice and based on laches. There are a number of reasons why the Debtor's arguments are without merit.

First, as explained above the termination of the Lease that is at issue in this proceeding is a termination based on the exercise of an early termination option pursuant to section 2.4 of the Lease. The Debtor's default may be relevant in determining whether a security deposit had to be returned. However, the Landlord (in this proceeding) is not invoking a right to terminate based on the payment defaults themselves. Whether those defaults could have justified a termination of the Lease (in the absence of the exercise of the early termination right) therefore is irrelevant. Similarly, any procedural prerequisites to a termination that is based on the existence of a payment default have nothing to do with exercise of the early termination option and the assessment of whether the security deposit needed to be returned.

20

Second, the Lease makes clear (as most commercial leases do) that the failure to make timely rent payments is automatically a default and does not require "notice" in order to constitute a default.  *See* Lease, § 18.1 ("Each of the following shall be an Event of Default . . . (a) Tenant shall fail to pay within ten (10) days Fixed Rent, Rent or any other Additional Rent required to be paid by Tenant under this Lease any three (3) times in any 12-month period . . .") The only default provisions in the Lease that require "notice" are those set forth in section 18.1(b) of the Lease, regarding the Tenant's failure to observe or perform any other term of condition of the Lease.  Accordingly, there is no "notice" prerequisite to the existence of a default that may be considered in deciding whether the terms of section 2.4 required a return of the security deposit.

Third, section 2.4 of the Lease provides that an early termination is effective as of the date set forth in the early termination notice.  The return of a security deposit is only a condition to the effectiveness of that termination if the Debtor is not in default.  The Debtor disputed the existence of such a default, but the Debtor's opposition does not mean that the effectiveness of the termination was delayed.

If the Debtor had prevailed on the disputed default issue at trial, and if the Debtor had demonstrated that it was entitled to a return of a security deposit, then there might have been merit to the Debtor's contention that the termination would not be effective until the security deposit were returned.  But the evidence at trial showed plainly that the Debtor is wrong.  The Debtor's payment defaults greatly exceeded the amount of the security deposit, so that nothing was owed to the Debtor with respect to the security deposit.  The trial before me therefore has confirmed that the Landlord had no obligation to return the security deposit as of the specified early termination date.  No court ever entered any order that prevented the termination from

21

taking effect pursuant to the Landlord's notice.  Since the Landlord's position has been

vindicated, and since no stay of termination ever was ordered, the termination was effective on

the date the Landlord specified in its notice of early termination.  *See First Nat'l Stores, Inc. v.*

*Yellowstone Shopping Center, Inc.*, 21 N.Y.2d 630, 637-38 (1968) (when landlord declared

termination of a lease on a ground that a tenant disputed and where the termination was never

stayed by a court, and where the landlord ultimately succeeded as to the merits of its contentions,

the termination was effective as of the date the landlord declared.)

## III.    Rogers NY's Standing to Seek Relief

In the Joint Pretrial Order the Debtor disputed allegations that Rogers NY had obtained

the property and had stepped into the Landlord's shoes.  The evidence at trial showed clearly that

Rogers NV transferred the relevant property to Rogers NY in April 2018 and that Rogers NY is

the current owner.  However, the Debtor continued to argue that Rogers NY cannot assert rights

as the Landlord under the Lease because (the Debtor alleges) Rogers NY did not serve certain

notices that allegedly were required.  The Debtor therefore contends that Rogers NY lacks

standing to pursue claims under the Lease.

The first problem with the Debtor's argument is that Rogers NY does not need to be a

party to the Lease in order to argue that the Debtor has no rights under the Lease.  All of the

Debtor's arguments are based on the false premise that Rogers NY seeks to evict the Debtor

based on a nonpayment of rent.  But the real reason why Rogers NY seeks the Debtor's removal

(and disputes the Debtor's rights to occupy the space) is its contention that the term of the

Debtor's Lease ended on December 31, 2018.  *See* Petition (Debtor Ex. 9).  Rogers NY plainly

owns the building, and as the current owner Rogers NY has standing to argue that the Debtor has

no rights to the space.  Rogers NY does not need to be a party to the Lease in order to make such

contentions.  Accordingly, even if the Debtor were correct in arguing that Rogers NY cannot

assert rights as a Landlord under the Lease, Rogers NY would still have the right to show that the

Debtor's rights were terminated by Rogers NV due to the delivery of a proper notice of early

termination and due to the fact that the Debtor was in default of its obligations under the Lease at

the time of termination.  As explained above, Rogers NY has made such a showing.

The Debtor also is wrong in its contentions that Rogers NY is barred from asserting any

rights of the "Landlord" under the Lease.  The Debtor bases its argument on section 248 of the

New York Real Property Law, which provides:

> An attornment to a grantee is not requisite to the validity of a conveyance of
> real property occupied by a tenant, or of the rents or profits thereof, or any
> other interest therein.  But the payment of rent to a grantor, by his tenant,
> before notice of the conveyance, binds the grantee; and the tenant is not liable
> to such grantee, before such notice, for the breach of any condition of the
> lease.

N.Y.R.P.L. § 248.  The Debtor argues that the last clause in section 248 should be interpreted as

meaning that the tenant has no liability of any kind to a grantee, no matter what the

circumstances, until properly notified that property has been transferred.  However, in context all

that section 248 says is that a tenant who pays rent to the original owner, before being notified of

a transfer, is not liable to the new owner to make a duplicate payment of that same rent.  This

limited applicability of section 248 is made clear upon consideration of section 223 of the Real

Property Law, which states (in relevant part):

> The grantee of leased real property, or of a reversion thereof, or of any rent,
> the devisee or assignee of the lessor of such a lease, or the heir or personal
> representative of either of them, has the same remedies, by entry, action or
> otherwise, for the nonperformance of any agreement contained in the
> assigned lease for the recovery of rent, for the doing of any waste, or for
> other cause of forfeiture as his grantor or lessor had, or would have had, if the
> reversion had remained in him. A lessee of real property, his assignee or
> personal representative, has the same remedy against the lessor, his grantee or
> assignee, or the representative of either, for the breach of an agreement
> contained in the lease, that the lessee might have had against his immediate

> lessor, except a covenant against incumbrances or relating to the title or
> possession of the premises leased.

N.Y.R.P.L. § 223.  State courts that have considered the two provisions have held that section

248 "is intended to protect tenants who have paid rent to a grantor of leased property without

notice of such conveyance;" that section 248 is not otherwise relevant in deciding what rights a

new owner possesses under a lease; and that section 223 gives the new owner "all of the rights"

that the prior owner had in a lease.  *See F.F. Proctor Troy Props. Co. Inc. v. Dugan Store, Inc.*,

191 A.D. 685, 688 (3d Dep't 1920); *see also Whitehall Tenants Corp. v. 3333 Operating Corp.*,

190 A.D.2d 595 (1st Dep't 1993) (where defendant did not claim that rent had been paid to the

prior owner, section 248 was irrelevant and a new owner could pursue a claim to collect rent

notwithstanding the absence of notice of a transfer); *World Challenge v. 39 Food*, 163 Misc. 2d

1081, 1082-83 (Civil Ct., N.Y. Cty. 1994) (same); *815 Park Owners, Inc. v. W.L.B. Admin., Inc.*,

119 Misc 2d 671, 673 (Civ. Ct. N.Y. Cty. 1983) (new owner succeeds to rights under a pending

termination notice).  In this case, the Debtor has not contended that it paid rental arrears to

Rogers NV after April 2018, and so section 248 is not relevant.

The Debtor also has argued that Rogers NY did not send a notice of the property transfer

that complied with the notice provisions of the Lease and that Rogers NY did not send a copy of

the transfer deed to 49 Bleecker Inc.  However, the notice provisions of the Lease are relevant

only to the particular notices that are "required or permitted" under the terms of the Lease itself.

*See* Lease, § 25.1.  There is no provision of the Lease that requires or contemplates any particular

notice of a property transfer.  The Debtor's own cited authorities stand for the proposition that a

notice given to satisfy statutory requirements (such as those under section 248 of the RPL) does

not need to comply with provisions in a lease that govern notices that are required or permitted

under the lease itself.  *See Arverne Ltd. Profit Hous. Corp. v. Taft's Dental, P.C.*, 63 Misc. 3d at

24

988; *see also Four Star Holding Co. v. Alex Furs, Inc.*, 153 Misc. 2d 447, 448 (1ˢᵗ Dep't 1992)

(statutory notices do not need to comply with lease requirements).  Section 248 of the Real

Property Law does not require any particular form of notice of a property transfer.  Rogers NY

offered, in evidence, a copy of an email message that advised 49 Bleecker Inc. and other tenants

of the property transfer; I find that this notice was delivered and I hold it was sufficient as

"notice" of the transfer under RPL § 248.

The Debtor also argues that section 21.2(b) of the Lease imposes limits on a new owner's

rights unless a formal attornment agreement is executed.  Section 21.2(b) is part of a series of

provisions that address the possibility of a mortgage foreclosure.  It provides:

> If, at any time prior to the termination of this Lease, ***any mortgagee (or any person, or such person's successors or assigns, who acquires the interest of Landlord under this Lease through foreclosure action or other action in lieu of foreclosure)*** shall succeed to the rights of Landlord under this Lease through foreclosure or otherwise, Tenant shall, at the election and upon request of any such person (collectively, "Successor Landlord"), provided that they present Tenant with a reasonable Non-Disturbance Agreement, attorn fully and completely, recognize any such Successor Landlord as Tenant's landlord under this Lease upon the then executory terms of this Lease.  The foregoing provisions of this subparagraph shall inure to the benefit of any such Successor Landlord, shall be self-operative upon any such demand, and no further instrument shall be required to give effect to said provisions.

Lease, § 21.2(b) (emphasis added).  By its terms, the only "Successor Landlord" to whom

section 21.2(b) would apply is a "mortgagee" or a person "who acquires the interest of Landlord

under this Lease through foreclosure action or other action in lieu of foreclosure."  Rogers NY

did not acquire its interest through foreclosure or through other action in lieu of foreclosure.  The

Debtor points to the fact that the following words refer to such a person's succession to the rights

of Landlord "through foreclosure or otherwise," but in the context of the prior words the only

person to whom this language is relevant is a person who acquires through foreclosure or

through actions in lieu of foreclosure.  The Debtor's effort to use the word "otherwise" to expand

the provision to all successor Landlords under all circumstances would turn the prior language into mere surplusage and would be contrary to the plain language of the provision.

Section 21.2(b) was designed to deal with the special situation of foreclosures, in which a tenant's interest might be extinguished along with the interest of an owner. Section 26.12 of the Lease more generally provides as follows:

> As used in this Lease, the term "Landlord" shall mean only the Landlord, so that in the event of any sale of the Building or of the Land and the Building or of said Lease in the event of a lease of the Building or of the Land and the Building said Landlord shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord hereunder thereafter to be performed or observed, and it shall be deemed and construed without further agreement between the parties or their successors in interest, or between the parties and any such purchaser or lessee, that such purchaser or lessee has assumed and agreed to performed *[sic]* and observe any and all covenants and obligations of Landlord hereunder first arising from and after the effective date of such transfer.

Lease, § 26.12. Section 26.12 plainly contemplates that in the event of a sale, the new owner takes over the position of Landlord without the need for any further agreement among the parties to the Lease, which is precisely what section 223 of the New York Real Property Law also contemplates.

For each of the foregoing reasons, the Debtor's "standing" arguments are without merit.

## IV.    The Presence of a Protected Residential Tenant

Mr. Zabari testified that at the time the Lease was executed a portion of the third floor space was occupied by Jen Gatien, who apparently was understood by the parties to be a commercial tenant under the name DeerJen LLC. Mr. Zabari testified that in January 2013 Ms. Gatien informed 49 Bleecker Inc. that she intended to move out soon and offered a payment of one month rent before doing so. Thereafter, Ms. Gatien apparently obtained a ruling that she is a residential tenant who is entitled to continue to live in the space pursuant to the terms of the New York Loft Law, codified in Article 7-C of the New York Multiple Dwelling Law.

26

The Debtor has made a large number of arguments at trial and in its post-trial submissions about the purported consequences of Ms. Gatien's tenancy, and I have attempted to address each of those arguments separately.

### A.    Alleged Misrepresentations/Alleged Deprivation of Quiet Enjoyment

In its post-trial submissions the Debtor argues that the very existence of Ms. Gatien as a tenant deprived the Debtor of "unencumbered possession" of the premises and therefore deprived the Debtor of its right to quiet enjoyment of the property.  The Debtor also argued that Rogers NV made misrepresentations about Ms. Gatien's tenancy and that these misrepresentations created defenses to the Debtor's payment obligations.  However, the only issue regarding Ms. Gatien's tenancy that the Debtor actually designated as a relevant issue for trial in the Joint Pretrial Order was the Debtor's contention that Ms. Gatien's status as an IMD tenant barred the Landlord from collecting rent and barred the Landlord from contending that the Debtor was in default.  The Joint Pretrial Order clearly states that the parties' prior pleadings were "deemed amended' to embrace "only" the contentions listed therein.  Issues regarding alleged misrepresentations, "quiet enjoyment," and allegations that the Debtor was entitled to rent offsets due to alleged failures to deliver "unencumbered" rights to the third floor were not properly identified as issues for trial in accordance with this Court's pretrial order requirements and therefore were not matters that the Debtor preserved the right to assert.

The belated claims also are contrary to the express provisions of sections 5.1 and 26.7 of the Lease, which confirmed that the Debtor had inspected the premises, that the Landlord had made no representations regarding the premises or their permissible use, and that the Debtor accepted the premises "as is."  Section 26.7 states:

> Neither Landlord nor Landlord's advisors or agents have made any
> representations or promises with respect to the physical condition of the

Property or the Building, the Demised Premises, permissible uses of Demised
Premises, the rents, leases, expenses of operation or any other matter or thing
affecting or related to the Demised Premises except as herein expressly set
forth, and no rights, easements, or licenses are acquired by Tenant by
implication or otherwise except as expressly set forth in the provisions of this
Lease.  Tenant has inspected the Building and the Demised Premises and is
thoroughly acquainted with their condition, and agrees to accept the same "as
is".  All understandings and agreements heretofore made between the parties
hereto are merged in this Lease, which alone fully and completely expresses
the agreement between Landlord and Tenant, and any executory agreement
hereafter made shall be ineffective to change, modify, discharge or effect an
abandonment of it, in whole or in part, or a surrender of this Lease or of the
Demised Premises or any part thereof or of any interest of Tenant therein
unless such executory agreement is in writing and signed by Landlord and
Tenant.  Notwithstanding the foregoing, Landlord hereby represents that it is
not a part (*sic*) to any agreement which would prohibit Landlord from
entering into this Lease.

Lease, § 26.7.  Section 5.1 provides:

Except as otherwise provided in this Lease, Tenant agrees to accept the
Demised Premises in its **AS-IS WHERE-IS** condition.  Tenant expressly
understands, acknowledges and agrees that, as of the date of this Lease, there
is no Permanent Certificate of Occupancy for the Building or the Demised
Premises.  Moreover, in the event that Tenant wishes to seek to obtain a
Certificate of Occupancy or a Temporary Certificate of Occupancy for the
Demised Premises, Tenant expressly understands, acknowledges and agrees
that Tenant shall be solely responsible for any and all costs or fees, including,
but not limited to, removing existing violations and the costs of any repairs or
alteration to the Demised Premises which are necessary to perform in order to
obtain any and all lawful approvals for a Certificate of Occupancy.

Lease, § 5.1.

The Debtor argues that it has the right to claim damages based on misrepresentations

notwithstanding the language of section 26.7 of the Lease, but the decision that the Debtor cites

in support of that proposition actually held to the contrary.  *See New WTC Retail Owner LLC v.*

*Pachanga, Inc.*, 160 A.D.3d 584, (1st Dep't 2018).  In *New WTC*, a landlord contended that

premises were actually ready for occupancy by a tenant, and the tenant disagreed.  The court held

that the tenant's agreement to accept the premises in its "as is" condition did not bar the tenant

from claiming that the landlord had "intentionally" caused a delay in preparing the premises for

the tenant's use so that there was a failure of consideration and a breach by the landlord of the landlord's own obligations. *Id*. at 585. However, the court dismissed the tenant's counterclaims for fraud in the inducement and negligent misrepresentation because those claims were barred by the explicit disclaimers, in the lease, as to whether any representations had been made. *Id*.

In any event, in this case there was a complete failure of proof as to the alleged misrepresentations and as to these particular defenses. Mr. Zabari tried to avoid giving a straight answer to the question, but he did not deny that he was aware (when the Lease was executed) that Ms. Gatien/DeerJen LLC was a tenant on the third floor. Instead, he acknowledged generally that he was aware of existing tenancies, though he said he understood that Ms. Gatien's tenancy was a commercial one and not a residential one. There was no proof that Rogers NV or any of its representatives made any representations at all about Ms. Gatien or about the nature of her tenancy at any time. By accepting the premises "as is" the Debtor accepted the space subject to whatever rights Ms. Gatien had. There is therefore no merit to the Debtor's new conditions that it somehow did not receive what it bargained for. The Debtor assumed whatever risks went with Ms. Gatien's tenancy.

### B.    Whether the Landlord Failed to Comply with the MDL with Respect to Tenants Other Than Ms. Gatien

In its post-trial submission, the Debtor has made assertions regarding alleged deficiencies under the MDL that were not even mentioned at trial. The Debtor argues that:

> There can be no dispute that (a) Unit 306 of the Premises is occupied residentially without a residential CO in violation of MDL §301, (b) Ms. Gatien, the residential occupant occupying Unit 306 without a residential CO has been doing so continuously since 2010, (c) even before Ms. Gatien commenced occupancy in 2010, an immediate prior residential occupant occupied Unit 306 without a residential CO since at least 2003, (d) since years before 2010, multiple other units on other floors of the Building outside the Premises have been, and continue to be, unlawfully residentially occupied without a residential CO in violation of MDL §301 as well . . .

*See* Debtor's Post-Trial Submission [Dkt. No. 50] at 8.  In fact, however, no evidence was

offered at trial to support the allegations regarding the duration of Ms. Gatien's tenancy, or as to

whether another residential occupant preceded her, or as to the alleged residential tenants in

other parts of the building.  Furthermore, with the exception of the effect of Ms. Gatien's tenancy

the listed items were not even identified in the parties' Joint Pretrial Order as contentions that the

Debtor intended to pursue at trial.  As a result the Debtor would not have been permitted to

pursue those contentions at trial even if it had offered any proof in support of them.

### C.    Whether the Absence of a Permanent Certificate of Occupancy for Ms. Gatien's Unit Excused the Debtor from All of Its Rent Obligations

The Debtor argues in its post-trial submission that no permanent Certificate of

Occupancy was in place for Ms. Gatien's unit and that her occupancy therefore is in violation of

section 301 of the Multiple Dwelling Law.  No proof was offered to support this contention.[4]  On

the other hand, the parties appeared to be in agreement at trial that Ms. Gatien had been certified

as the occupant of a unit in an "Interim Multiple Dwelling" (or an "IMD"), and the Petition filed

by Rogers NY in the state court includes an acknowledgment that Ms. Gatien had that protected

status.  By definition, an IMD is a non-residential building that has been occupied as a residential

---

[4]    In its post-trial submission the Debtor has belatedly urged me to take judicial notice of a large collection of certificate of occupancy records available on the New York Buildings Information System.  However, the records were not offered at trial and the evidentiary record was closed.  No timely request was made that I take judicial notice of them, so they are not properly part of the evidentiary record.  In addition, the records themselves do not plainly disclose information of a kind for which judicial notice would be proper.  The cited web-site does not include any clear disclosure as to a particular fact or circumstance.  Instead, the Debtor has invited me personally to comb through a byzantine collection of records and to come to my own conclusions (unguided by witnesses) as to what a massive collection of building department records might show.  The proposed records also do not include records of applications to the Loft Board and rulings by the Loft Board, and therefore would not even be a complete set of relevant applications or orders.  The Debtor's request that I embark on my own unsupervised fact-finding mission on these points is not a proper or timely request for judicial notice and I decline the request.

building without a certificate of occupancy for residential apartments. I will presume, therefore (based on the apparent concession that Ms. Gatien is an IMD tenant) that the building properly is subject to the provisions of the Article 7-C of the Multiple Dwelling Law, and that at least at some point the building did not have a certificate of occupancy for residential units.

The Debtor contends that the absence of a permanent certificate of occupancy bars Rogers NY from collecting any rents, citing section 302 of the Multiple Dwelling Law. However, section 285 of the Multiple Dwelling Law makes clear that, notwithstanding the provisions of section 302, the owner of an interim multiple dwelling may recover rent payable from residential occupants so long as the owner is in compliance with the provisions of Article 7-C. Again, the Debtor offered no proof whatsoever as to the status of the Landlord's compliance with Article 7-C and therefore no proof that section 302 is applicable. Nor did the Debtor offer proof as to what efforts had been made to obtain a permanent certificate of occupancy, the time periods when such efforts were made, or as to whether or not the Debtor had complied with any of the various sub-parts to section 284 of the Multiple Dwelling Law. At least one New York court has held that the prohibitions against the collection of rent that are set forth in section 302 of the Multiple Dwelling Law do not apply so long as a party has complied with its obligation under section 284 of the Multiple Dwelling Law to take reasonable action to pursue a certificate of occupancy. *See Cromwell v. Le Sannom Bldg. Corp.*, 171 A.D.2d 458, 459 (1st Dep't 1991) ("Despite the provisions of MDL 302, and despite any possible contrary interpretation of our recent decision in *County Dollar* (supra), we find that compliance with MDL 284 is sufficient to entitle the owner to collect rent or use and occupancy.")

Given the failure of proof, I ordinarily would rule that the Debtor had failed to establish that section 302 is even applicable to the disputes before me. However, the parties also appear to

31

be in agreement that the New York courts have held that the Debtor is barred from collecting

rent from Ms. Gatien. Indeed, there is a reported decision to that effect by the Appellate

Division. *See Matter of 49 Bleecker, Inc. v. Gatien*, 157 A.D.3d 619 (1st Dep't 2018). In that

reported decision, the Appellate Division held that for purposes of the Multiple Dwelling Law

the term "owner" includes a lessee who sub-lets to a residential tenant. It therefore held that the

Debtor (as the landlord to Ms. Gatien) was barred under section 302 from collecting rent from

Ms. Gatien while the building lacked a certificate of occupancy for residential use. *Id.* In light

of the parties' apparent agreement as to the existence of this ruling I will therefore presume that

section 302 is applicable to Ms. Gatien in particular, notwithstanding the fact that there was an

almost complete absence of proof at trial as to the reasons why this might be the case.

It does not matter in the end, because the Debtor has over-stated the effect that the

absence of a permanent certificate of occupancy might have. Section 302 of the Multiple

Dwelling Law states that in the absence of a certificate of occupancy for a residential space no

rent can be collected by the owner of the building. The Debtor contends that this provision

applies not only to the collection of rent from the residential tenant, but also to the collection of

rent from commercial tenants in the same building. However, most of the authorities cited by the

Debtor do not even consider that proposition. *See Chazon LLC v. Maugenest*, 19 N.Y.3d 410

(2012) (holding that MDL § 302 protects residential tenants from rent demands, but setting forth

no discussion of the effect of MDL § 302 on the collection of rent from commercial tenants);

*Cromwell v. LeSannom Bldg. Corp.*, 171 A.D.2d 458 (same); *Cty. Dollar Corp. v. Douglas*, 160

A.D.2d 537 (1st Dep't 1990) (same); *Mapama Corp. v. Nadelson*, 155 A.D.2d 233 (1st Dep't

1989) (same); *902 Assocs., Ltd. v. Total Picture Creative Servs., Inc.*, 144 Misc. 2d 316 (N.Y.

Sup. App. Term 1989) (same). The decision in *Finkelstein v. Reyes*, 75 Misc. 2d 340 (Civ. Ct.

N.Y. Cty. 1973), merely declined as a factual matter to find that a commercial tenancy was

exclusive to an adjoining multiple dwelling, and therefore also did not even address the relevant

question. Other decisions that the Debtor cited have held that a failure to comply with the MDL

bars rent collection from an entire residential building, but these decisions similarly do not even

discuss the question of whether commercial tenants are treated differently, *See, e.g., 208 Himrod

v. Irizarry*, 42 Misc.3d 145(A) (App. Term 2014).

The Debtor has cited two cases for the proposition that section 302 bars the collection of

rent from a commercial tenant as well as from residential tenants. *See Ying Lung Corp v.

Medrano*, 123 Misc.2d 1074 (Civ. Ct. N.Y. Cty. 1984) (a commercial tenant may invoke section

302 as a defense to the payment of rent); *Elizabeth Broome Realty Corp. v. China Printing Co.,

Inc.*, 157 Misc. 2d 572 (Civ. Ct. N.Y. Cty. 1993) (holding that section 302 barred the collection

of rent from a commercial tenant as well as from residential tenants). However, the Debtor

failed to note that those decisions were criticized in a later Civil Court decision that found the

earlier holdings to be contrary to other established New York law and contrary to a proper

reading of the statute. *See 455 Second Ave. LLC v. N.Y. Sch. Of Dog Grooming, Inc.*, 37 Misc.

3d 933 (Civ. Ct. N.Y. Cty. 2012). In *455 Second Ave.*, the Civil Court noted that it was well-

established in prior case law that commercial tenants have no right to withhold rent based on the

absence of a certificate of occupancy. *Id.* The court further held that the better interpretation of

the relevant provisions of the Multiple Dwelling Law is that section 302 has a "limited

application" only to residential tenants. *Id.* The Civil Court therefore held in *455 Second Ave.*

that section 302 is not available as a defense to the payment of rent by a commercial tenant.

The Debtor has also cited to the decision in *Tysons Assocs. v. Tribeca Audio Research,

Inc.*, 140 Misc. 2d 38 (Civ. Ct. N.Y. Cty. 1988). In that case, a landlord filed a proceeding

against four separate tenants, at least one of whom admittedly was subject to the protections under the Multiple Dwelling Law. The Civil Court held in *Tysons* that since at least some of the respondents were protected tenants, the landlord needed to allege and prove its compliance with the MDL. The limited scope of the *Tysons* decision was made clear in a later decision by the Civil Court in 1990. *See Spring St. Assocs. v. Reardon*, 146 Misc. 2d 888 (Civ. Ct. N.Y. Cty. 1990). In *Spring Street,* the Civil Court noted that the New York Court of Appeals had previously held, in a 1985 decision, that "even if a portion of a building is an interim multiple dwelling, nonresidential space in the building is exempt from article 7-C." *See Matter of Lower Manhattan Loft Tenants v. New York City Loft Board*, 66 N.Y.2d 298, 305 (1985). The court in *Spring Street* therefore held that compliance with section 284 of the MDL was not relevant in an action against a commercial tenant and did not constitute a defense to the commercial tenant's rent obligations. The court distinguished *Tysons* as merely holding that if one or more of the named respondents was a protected tenant, compliance with section 284 needed to be alleged.

The decision in *455 Second Ave.* is the most recent authority we have found on this point, and that decision (and the decision in *Spring Street*) are the most persuasive. I must also note that the more extreme position that the Debtor has taken on this issue in its post-trial submission is flatly at odds with other positions the Debtor has taken in this bankruptcy case, including statements made during the June 7 trial. During the trial, counsel for the Debtor argued that rent could not be collected from Ms. Gatien, and that this prohibition somehow ran "vertically" to the Landlord so that the Landlord could not collect an equivalent amount of rent from the Debtor. However, counsel denied that the Debtor was contending that the Landlord was barred from collecting any rents at all. The asserted defense, at trial, was limited to amounts attributable to Ms. Gatien's space.

34

In addition, as noted above the Appellate Division has held that section 302 is applicable to the Debtor's own dealings with Ms. Gatien. However, the Debtor admittedly has other sub-tenants, and the Debtor never stopped collecting rents from them. In fact, some or all of those other sub-tenants have placed rents in escrow following the early termination date, where they have remained until the Debtor's disputes with Rogers NY are resolved. The Debtor has steadfastly insisted throughout the bankruptcy case that the Debtor has a right to those rent payments and the Debtor has accused Rogers NY of wrongly diverting those rent payments away from the Debtor. But if section 302 applies to the Debtor (as the Appellate Division has held), and if section 302 does not bar the Debtor from collecting rents from its commercial sub-tenants (as the Debtor repeatedly has argued), then similarly section 302 does not bar the Landlord from collecting rents from its commercial tenants, including the Debtor.

I hold that section 302 did not operate as an absolute bar to the collection of rent from all tenants in the building as a general matter and that it did not excuse the Debtor from the entirety of its rent obligations.

### D.    Whether Ms. Gatien's Failures to Pay Rent Excused the Debtor from A Portion of the Debtor's Rent Obligations

The Debtor also has suggested that its own obligation to pay rent was automatically reduced because the Debtor did not actually receive rents from Ms. Gatien. However, the Debtor is a commercial tenant and as stated above the Debtor itself is not entitled to the protections of section 302. It is also well-established that a commercial tenant's obligation to pay rent is not excused by the absence of a certificate of occupancy unless a landlord has undertaken to obtain one, which the Landlord in this case did not do. *See Phillips & Huyler Assocs., v. Flynn*, 154 Misc. 2d 689, 692 (Civ. Ct. N.Y. Cty. 1992 (incorrect certificate of occupancy did not permit commercial tenant to withhold rent); *Silver v. Moe's Pizza, Inc.*, 503 N.Y.S.2d 86, 88 (App. Div.

2d Dep't 1986) (where landlord made no covenant to obtain a certificate of occupancy and the commercial tenancy was undisturbed the tenant was obligated to pay rent).  Nor did the Debtor have any right to a rent offset under the Lease.  Section 3.1 of the Lease provides that the Debtor must pay rent "without any deduction or set off whatsoever, except as expressly provided for in this Lease," and the Lease does not provide for any deduction or offset based on an inability to collect rent from sub-tenants.

Mr. Zabari contended vaguely at trial that he might have had a conversation with Mr. Rogers about reducing rent payments in light of Ms. Gatien's tenancy, but as noted above the testimony was entirely vague and not credible, and I find that no such agreement existed.

In addition, even if section 302 could be interpreted as excusing the Debtor from some portion of its rent obligation (a portion attributable to the space occupied by Ms. Gatien), or if the Debtor had otherwise been entitled to such a reduction, the Debtor should have offered proof of the uncollected amounts if the Debtor wished to prove an offset to its rent obligations.  The Debtor did not do so.  Mr. Zabari testified generally that he received a rent payment from Ms. Gatien in January 2013 and no further rent payments, but he never said what amounts she owed or what proportion of the third floor she occupied.  The Debtor has argued in its post-trial papers that the inability to collect rents from Ms. Gatien cost the Debtor "several thousands of dollars monthly" over a course of five years, but no evidence was offered at trial to support this contention.

Furthermore, even if the Court were to assume that the Debtor's post-trial reference to "several" thousand dollars meant a monthly rent of as much $4,000 (an amount higher than "several" thousand dollars), the maximum amount payable by Ms. Gatien from February 2013 through the early termination date would have been approximately $284,000.  Even if that

amount had been proved, and even if the Debtor had established a right to an offset to its own

rent obligations in that amount, the Debtor's payment arrears as of December 31, 2018 still

would have exceeded $130,000 – far more than the $20,000 security deposit.  The Debtor still

would not have been entitled to a return of its security deposit, and the early termination still

would have been effective as of December 31, 2018.

### E.      Whether The Landlord Could Have Sought Ejectment of the Debtor Based on Payment Defaults

The Debtor again seeks to analogize the termination at issue here to a termination based

on a nonpayment of rent, and argues that Rogers NY would have been barred from seeking an

ejectment of the Debtor or otherwise pursuing a special proceeding based on a nonpayment of

rent.  Once again, however, the termination that is at issue here is a termination pursuant to the

exercise of an early termination option.  Whether Rogers NY could have pursued a separate court

action for termination based on a payment default is irrelevant to this question.

### F.      Ms. Gatien's Rights Do Not Bar a Termination of the Debtor's Intervening Lease

Finally, the Debtor has argued that Ms. Gatien's rights as a sub-tenant cannot be

terminated by virtue of the provisions of the Loft Law, and therefore that the Debtor's own Lease

cannot be terminated.  The Debtor's argument is incorrect.  Whatever rights Ms. Gatien may

have pursuant to section 302 of the Multiple Dwelling Law with respect to a termination of her

own tenancy has no bearing on the right of Rogers NY to terminate the intervening tenancy of

the Debtor through the exercise of an early termination option.

If Ms. Gatien is entitled to protections under state law, that just means that Rogers NY

may not be able to evict her for nonpayment and may be obligated to attorn to her.  There is

nothing about her protected status, however, that interferes with the early termination of the

rights of intermediate tenants such as 49 Bleecker Inc. The Debtor does not contend that it is residential tenant or that the Debtor has any rights of its own under the Multiple Dwelling Law. There is nothing about Ms. Gatien's tenancy that prevented the Landlord from exercising the early termination right with respect to the Debtor's separate tenancy, or that prevented the Debtor's payment defaults from being treated as "defaults" in determining whether the return of the security deposit was required, or that required that the Debtor's intermediate tenancy remain in effect.

The Debtor has also argued that in prior notices the Landlord sought to extinguish all of the Debtor's interests in the Premises under the Lease. In the Debtor's view, this can only mean that the Landlord was also seeking to evict Ms. Gatien, with the result that the early termination notice allegedly was illegal. But the early termination of the Debtor's Lease (which is what the Landlord sought) just eliminates the Debtor's own interests in the property. Sub-tenants have whatever rights they have by way of their own leases or by virtue of state law. The Debtor's own interests can be fully extinguished without regard to whether that does or does not affect sub-tenants. The Debtor cannot latch onto those parties' separate rights to try to hold onto property interests to which the Debtor itself is not entitled.

## Conclusion

For the foregoing reasons, I hold that a proper notice of early termination was sent to the Debtor and was received by the Debtor; that the Debtor was in default for nonpayment of rent and was not entitled to a return of its security deposit; that the Lease terminated as of December 31, 2018; that Rogers NY has standing to seek the removal of the Debtor from the premises and to raise the issues addressed in this Decision; and that the Debtor's other defenses are without merit. The Debtor is a holdover tenant with no rights to possession under the terminated Lease.

The parties are directed to appear before the Court on June 17, 2021 at 10:00 a.m. to discuss any

further proceedings or rulings that may be appropriate with regard to Rogers NY's request for

relief from the automatic stay and with regard to the Debtor's pending motion for an extension of

time to assume or reject the Lease.

Dated: New York, New York
     June 15, 2021

<u>/s/</u> **Michael E. Wiles**
HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE